**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CHRISTOPHER S. MILAM,**

     **Plaintiff,**

**vs.**                           **CIVIL ACTION NO. 2:16-CV-06002**

**NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security concluding that there was insufficient evidence to support a finding that the Plaintiff was disabled as of June 29, 2010, and therefore, terminating the Plaintiff's benefits. The Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered March 28, 2017, (Document No. 26.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) as to whether the decision to terminate the Plaintiff's benefits was based on the substantial evidence. Presently pending before the Court are the Plaintiff's Brief in Support of Motion for Summary Judgment, and the Defendant's Brief In Support of Defendant's Decision. (Document Nos. 33 and 34.)

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for summary judgment (Document No. 33.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 34.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

**Procedural History**

The Plaintiff, Christopher S. Milam (hereinafter referred to as "Claimant"), protectively filed his applications for Titles II and XVI benefits on October 19, 2009 and March 31, 2010, respectively, alleging disability since July 31, 2009. (Tr. at 207-213.) His Title II claim was initially denied on March 23, 2010 (Tr. at 91-95.) and again upon reconsideration on April 12, 2010, along with his Title XVI claim. (Tr. at 97-99, 100-102.) Claimant subsequently filed a written request for hearing on April 27, 2010. (Tr. at 103-104.) Without a hearing, David B. Daugherty, Administrative Law Judge ("ALJ") found Claimant was under a disability from July 31, 2009 by decision dated June 29, 2010. (Tr. at 75-83.)

By correspondence dated May 18, 2015, the Social Security Administration notified Claimant that his disability benefits were suspended because the Office of the Inspector General suspected fraud was involved in certain cases that included evidence from Bradley Adkins, Ph.D., Srinivas Ammisetty, M.D., Frederick Huffnagle, M.D., or David P. Herr, D.O. (Tr. at 122-127.) Because such evidence had been submitted on Claimant's behalf by his then representative, Eric C. Conn, Claimant's entitlement to benefits had to be redetermined. (Id.)

On August 25, 2015, the Appeals Council issued its order remanding Claimant's case for redetermination before another ALJ. (Tr. at 85-90.) On December 22, 2015, an administrative

hearing was held before the Honorable Amy Benton, ALJ. (Tr. at 37-69.) On March 25, 2016, the

ALJ entered a decision finding Claimant had not been under a disability at any time from July 31,

2009 through June 29, 2010, the date of the prior decision. (Tr. at 14-36.) On April 19, 2016,

Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 8-13.) The ALJ's

decision became the final decision of the Commissioner on April 30, 2016 when the Appeals

Council denied Claimant's Request for Review. (Tr. at 4-7.)

On July 5, 2016, Claimant timely brought the present action seeking judicial review of the

administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.) The Commissioner

filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 30 and 31.)

Subsequently, Claimant filed his Brief in Support of Motion for Summary Judgment (Document

No. 33.), and in response, the Commissioner filed a Brief in Support of Defendant's Decision.

(Document No. 34.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 34 years old on the date of the prior decision finding him disabled, and is a

"younger person" by the Regulations throughout the underlying proceedings. See 20 C.F.R. §§

404.1563(c), 416.963(c). (Tr. at 28.) Claimant is a high school graduate. (Tr. at 42.) Claimant last

worked on July 31, 2009 when he suffered a back injury while employed as a mining operator.

(Tr. at 43-44.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has

the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).

A disability is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§

404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

**Summary of ALJ's Decision**

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

From the outset, the ALJ acknowledged that pursuant to Sections 205(u) and 1631(e)(7)[3] of the Social Security Act, in her redetermination of whether Claimant was entitled to benefits, she must disregard the evidence from the aforementioned medical providers, but specifically in this case, the evidence from Frederic T. Huffnagle, M.D. dated May 26, 2010. (Tr. at 17, 18, 19, 20.) The ALJ next determined that Claimant met the insured status requirements through December 31, 2013. (Tr. at 21, Finding No. 1.) The ALJ then determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since July 31, 2009, the alleged onset date, through June 29, 2010, the date of the prior ALJ decision. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: history of fractured right clavicle and status-post broken traverse process at L2-L4. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that the severity of Claimant's impairment did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 23, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work except he

> (1) could occasionally climb stairs and ramps; (2) could never climb ladders and scaffolds; (3) could frequently balance, stoop, kneel, and crouch; (4) could occasionally crawl; (5) must have avoided concentrated exposure to industrial vibration; (6) must have avoided even moderate exposure to hazards such as unprotected heights and moving mechanical parts; and (7) could have performed frequent reaching in all directions with upper dominant extremity.

(Id., Finding No. 5.) At step four, the ALJ found that Claimant was incapable of performing his past relevant work through June 29, 2010, the date of the prior decision. (Tr. at 28, Finding No. 6.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC through June 29, 2010, the date of

---

[3] This is codified as 42 U.S.C. §§ 405(u) and 1383(e)(7).

the prior decision, indicated that there were jobs that existed in significant numbers in the national economy that Claimant could have performed. (Id., Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability since July 31, 2009 through June 29, 2010, the date of the prior decision. (Tr. at 29, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ's decision is not supported by substantial evidence. For starters, Claimant argues that his injuries met Listing 1.04A for a continuous period of at least twelve months: (1) he suffered a vertebral fracture; and (2) Claimant suffered from a nerve root compression. (Document No. 33 at 2-3.) Claimant's compromised nerve root was evidenced by his ongoing pain and numbness in his lower back and right leg, Drs. Weinsweig, Stauffer, and Nadar indicated Claimant had radiculopathy, Claimant had a limited range of motion in his spine, Dr. Stauffer found Claimant had a slight loss of reflex in his lower right leg, and Claimant had positive straight-leg tests. (Id. at 3-5.)

Claimant also contends that he could not have performed other work at the time, because he testified that he could only stand for about ten minutes at a time, must lay in a reclined position, and could not stoop or squat without pain. (Id. at 5.) Further, the ALJ ignored the vocational expert's testimony that if an individual like Claimant had to take unscheduled five-minute breaks every forty-five minutes, then there would be no jobs. (Id. at 5-6.)

Finally, Claimant argues that the ALJ's determining that he was not entirely credible is inconsistent with the record: he testified that he could only squirrel hunt without venturing more than ten yards from his vehicle; and the drive from his home in Rawl, West Virginia is less than seven hours to Paducah, Kentucky, not twelve hours found by the ALJ. (Id. at 6.) Claimant moves

for judgment of disability as a matter of law. (<u>Id</u>. at 7.)

In response, the Commissioner points out that Claimant must demonstrate that his injuries satisfy all the specified medical criteria of Listing 1.04A, and his fractured transverse processes at L2, L3 and L4 do not constitute a "vertebral fracture", but assuming otherwise, there was no evidence that it caused any nerve root compression or spinal cord compromise. (Document No. 34 at 12-13.) Contrary to Claimant's assertions otherwise, there was also no objective medical evidence that he suffered motor loss, sensory or reflex loss: Drs. Weinsweig, Stauffer and Nadar each noted full motor strength or intact reflexes with no sensory deficits. (<u>Id</u>. at 13.) Further, just because one-time examiner Dr. Stauffer noted a slight reflex loss in Claimant's right leg, the Listings require this must be documented consistently over a period of time, not just a single occasion. (<u>Id</u>. at 13-14.) Moreover, Claimant only saw neurologist Dr. Weinsweig once, and received no further lumbar spine treatment or any other medical provider during the relevant period. (<u>Id</u>. at 14.) However, shortly after he was awarded benefits, Claimant drove over 400 miles to see a doctor in Kentucky for pain medication. (<u>Id</u>.)

Despite the acute injuries to his shoulder and back, the few physical examinations during the relevant period were essentially normal, and the medical opinion evidence supported the ALJ's finding that Claimant would have been capable of a range of light work. (<u>Id</u>. at 15-16.) Furthermore, where the evidence shows that an individual can perform light work, the individual is also capable of sedentary work, which is even less physically demanding, regardless of Claimant's testimony to the contrary. (<u>Id</u>. at 17.) The Commissioner also argues that the ALJ was entitled to reject the vocational expert's testimony in response to a hypothetical question that was unsupported by the evidence of record. (<u>Id</u>.)

Finally, the Commissioner contends that the ALJ provided a proper credibility analysis, and that Claimant's testimony of disabling pain and other symptoms were inconsistent with the objective medical evidence of record as well as his statements in his Function Report. (Id. at 17-19.) In closing, the Commissioner asks that the final decision finding Claimant was not disabled at the time of the initial award be affirmed because it was based on substantial evidence. (Id. at 19.)

## The Relevant Evidence of Record[4]

The undersigned has considered all evidence of record, including the medical evidence,[5] pertaining to Claimant's arguments and discusses it below.

Claimant's Daily Activities and Statements of Functioning:

In October 2009, at the time he filed his applications, Claimant alleged difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. (Tr. at 298.) The most he could lift was a trash bag. (Id.) He estimated he could walk for about 5 to 10 minutes before needing to rest, and sit for about 30 minutes before needing to change position due to back pain and numbness in his leg. (Id.)

In February 2010, Claimant described his daily activities as waking up at 6:00 a.m.; performing all basic self-care duties independently; helping with household chores such as cooking, laundry, and dishes; watching television; and helping his children with dinner and getting them to bed. (Tr. at 293, 374.) On occasion, he went to the store, ran errands with his wife, and went out to eat. (Tr. at 374.) At this time, he was attending physical therapy sessions twice per

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.
[5] The medical evidence referenced herein is the evidence from the relevant period.

week. (Id.)

Medical Evidence:

In March 2009, Claimant presented to the hospital after being hit on the head and right shoulder with a large rock while working as a mining operator. (Tr. at 503.) Hospital staff observed a minor abrasion on the top of Claimant's head and an abrasion on his right shoulder with associated tenderness. (Tr. at 504, 509-510.) There was no significant cervical spine tenderness, musculature spasm, or paracervical tenderness, and he had full range of motion without pain. (Tr. at 509.) A cervical spine CT scan revealed no acute fracture. (Tr. at 510.) He was discharged the following day in stable condition; his pain had improved, and he was fitted with a sling for shoulder immobilization, and he received a small quantity of Lortab. (Tr. at 505, 510.)

In August 2009, Claimant presented to the hospital with complaints of lower back pain after another work-related injury. (Tr. at 348, 352, 523, 527.) The physical examination revealed a tender lower back, but a negative straight-leg raising test, normal strength, normal sensation, and full range of motion in his extremities. (Tr. at 526.) A lumbar spine CT scan showed non-displaced fractures of the right transverse process of L2, L3, and L4[6], but intact vertebral bodies and disc spaces with no herniation. (Tr. at 350, 356, 526-527, 530.) At discharge, Claimant was instructed to apply heat to his back and use Skelaxin (a muscle relaxer) and Medrol Dosepak (an anti-

---

[6] The Commissioner has referenced for the Court's convenience: "A transverse process is a bony protrusion from the back of a vertebral bone in the spine. There is one on each side of every vertebrae. The majority of fractures are treated conservatively, without surgery, although a brace may be used to ensure the spine is kept straight to allow healing. See http://www.sportsinjuryclinic.net/sport-injuries/low-back-pain/transverse-process-fracture (last visited July 11, 2017). Transverse process fractures are commonly seen with trauma, but are considered a minor and stable type of lumbar fracture. See https://radiopaedia.org/articles/transverse-process-fracture (last visited July 11, 2017). It may take up to six weeks for a transverse spinal fracture to heal. See https://radiopaedia.org/articles/transverse-process-fracture (last visited July 11, 2017)." (Document No. 34 at 7, fn7.)

inflammatory steroid). (Tr. at 357.) He was given a work excuse for 10 days. (Tr. at 523.)

Hospital staff referred Claimant to David Weinsweig, M.D., a neurologist, for follow up. (Tr. at 528-529.) During a September 2009 appointment, Dr. Weinsweig noted that Claimant complained of lower back pain radiating into his right leg, but found that hip rotation and straight leg raising did not bother him much. (Tr. at 366.) In addition, the physical examination showed strong motor strength, intact sensation, and equal reflexes. (Id.) Dr. Weinsweig's impression was pain related to the transverse process fractures and that Claimant "may have an element of radiculopathy." (Id.) Dr. Weinsweig ordered an MRI of Claimant's lumbar spine that confirmed right transverse process fractures at L2, L3, and L4 with no vertebral body compression fracture or disc herniation. (Tr. at 368.) Compared to the previous August 2009 CT scan, the fractures were "much less conspicuous on MR but there is no edematous change to indicate that these are acute and have presumably progressed into a chronic inactive status." (Id.) The radiologist did not identify any nerve root or spinal cord compression. (Id.) Dr. Weinsweig recommended lumbar flexion/extension x-rays, and six to eight weeks of physical therapy. (Tr. at 366.)

In March 2010, W. Roy Stauffer, M.D. performed a consultative internal medicine examination at the State agency's request. (Tr. at 378-381.) Dr. Stauffer's physical examination revealed tenderness over the lumbar spine with reduced flexion; some tenderness in Claimant's right shoulder at the acromioclavicular joint but no other joint abnormalities; decreased right shoulder flexion, abduction, and external rotation; an intact gait and station without need for a cane; 5/5 strength in the bilateral upper and lower extremities; no extremity clubbing, cyanosis, or edema; intact sensation; the ability to squat; the ability to walk on his heels and toes, although it caused low back and right leg pain; and no difficulty with fine and gross manipulation. (Tr. at 379-

380.) Dr. Stauffer "did not find a lot today on exam" regarding Claimant's back, but felt he may have a mild right lower extremity radiculopathy. (Tr. at 380.) Within one year of his back injury, Dr. Stauffer opined that Claimant could perform the exertional demands of light work with some limitations on climbing ladders, ropes, and scaffolds due to his right shoulder, and that he could occasionally balance, stoop, kneel, crouch, and crawl. (Id.) He also felt Claimant "may have some difficulty reaching with his right upper extremity due to his fractured clavicle," but found no other manipulative limitations. (Id.) Finally, he did not assess any visual, communicative, or environmental limitations. (Id.)

In March 2010, State agency medical expert, Uma Reddy, M.D., reviewed the record evidence, including Dr. Stauffer's consultative report. (Tr. at 398-405.) Dr. Reddy noted that Claimant had some mild physical limitations at that time, but no neurological deficits, and he was being treated with pain medications. (Tr. at 403.) Accordingly, Dr. Reddy reduced Claimant's RFC to the medium level of exertion that involved frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to vibration or hazards such as machinery or heights. (Tr. at 399-402.) In April 2010, at the reconsideration level of administrative review, State agency physician James Egnor, M.D., affirmed Dr. Reddy's assessment. (Tr. at 406.)

In November 2010, Claimant presented to Allen Tinsley, M.D., a physician at Comprehensive Premier Medicine located in Paducah, Kentucky. (Tr. at 532.) Claimant claimed he had sustained a "broken back" in July 2009 while working in the coalmines, and brought with him paperwork showing his SSI award. (Id.) He also reported he was taking Lortab twice per day for pain; it was noted that "He and his father drove 12 hours from West Virginia for the exact same

prescriptions, they bring no old x-rays or scans". (Id.) Dr. Tinsley's physical examination elicited some pain on straight leg-raising on the left, but no gross focal weakness. (Tr. at 533.) Dr. Tinsley prescribed Claimant two weeks of Lortab and Xanax, but advised that he "can't be the doctor of record for someone who lives in West Virginia" and referred him to a pain clinic. (Id.)

In December 2010, Anbu Nadar, M.D. performed an independent medical examination in connection with Claimant's worker's compensation claim. (Tr. at 536-538.) Claimant explained how he was injured in a March 2009 work-related accident after which he was off work for approximately six weeks before returning. (Tr. at 536.) He alleged that he still had residual right shoulder pain, stiffness, and aching, but denied any instability and numbness. (Id.) Claimant also related his subsequent work-related injury in July 2009 where he sustained a back injury. (Id.) He claimed he could not return to work since the back injury due to chronic pain. (Id.)

Dr. Nadar's examination of Claimant's right shoulder detected no swelling, erythema, or warmth, although he was tender to palpation over the clavicle. (Tr. at 537.) Claimant had no shoulder instability, and the drop test, push-off test, O'Brien test, and sulcus sign were all negative. (Id.) The physical examination of Claimant's spine elicited tenderness over the paravertebral lumbosacral muscles, more so on the right than the left; back pain during straight leg-raising to 70 degrees while sitting, and to 30 degrees while lying down; intact reflexes; no sensory deficits; the ability to tiptoe and stand on his heels but with difficulty; and independent ambulation. (Id.)

Dr. Nadar's impression was right clavicle fracture with residual stiffness; lumbosacral strain with radiculopathy; and avulsion fracture of the transverse process of L2, L3, and L4 on the right side. (Id.) He opined Claimant had reached maximal medical improvement from treatment but would need to continue analgesics and anti-inflammatories. (Tr. at 538.) He further opined that

Claimant should be restricted to lifting no more than 25 pounds occasionally and 10 to 15 pounds occasionally, which would preclude his former employment in the coalmines. (Id.)

**The Administrative Hearing**

Claimant Testimony:

At his December 2015 redetermination hearing, Claimant testified that he last worked on his alleged onset date, July 31, 2009, and did not work at any point from that date through June 29, 2010. (Tr. at 43.) Claimant testified that his back injury prevented him from working, and that it had gotten worse. (Id.)

As for daily activities, he testified that he watched television and chatted with his wife, but did no household chores. (Tr. at 47.)

Claimant stated that with therapy after his injury, he was able to walk for about five minutes before he had to take a break (Tr. at 46.); he estimated that he could stand for about ten minutes, about an hour total out of an eight-hour workday. (Tr. at 53-54.) Claimant stated that he could sit upright in a chair for up to thirty minutes, but he would need to get up and stretch or his leg will go numb. (Tr. at 47, 53.) Claimant testified that he has to sit with his legs elevated in a recliner most of his day, about five to six hours in an eight-hour workday, and that he would need to remain reclined from about ten to thirty minutes at a time, and needed to recline like that about thirty times a day. (Tr. at 54-55.) Claimant estimated that he could lift about ten pounds. (Tr. at 47.)

Claimant testified that he had problems with walking, his leg would go numb and trip him up; that he has difficulties with climbing stairs, bending over, and squatting. (Tr. at 56-57.) He stated that he could never crawl and avoided having to kneel; he could tolerate the vibrations from riding in a vehicle. (Tr. at 57.) By the winter following his injury, he admitted that he was able to

drive his truck to go hunt for squirrel, but that it was for "a little bit", and he would only step out of his truck for about ten yards. (Tr. at 48.) Claimant testified that he did not drive much during the relevant period, about ten to fifteen minutes and usually had his wife drive. (Tr. at 57-58.)

Barbara Holmes, Vocational Expert ("VE") Testimony:

The VE classified Claimant's most recent job as a coal miner operator was medium work as it was generally performed to very heavy as it was actually performed. (Tr. at 43-44, 62-63.) The ALJ asked the VE to assume an individual of Claimant's age, education, and past work experience who could physically perform light work but: (1) could only occasionally climb stairs and ramps; (2) could never climb ladders and scaffolds; (3) could frequently balance, stoop, kneel, and crouch; (4) could occasionally crawl; (5) must avoid concentrated exposure to industrial vibration; (6) must avoid even moderate exposure to hazards such as unprotected heights and moving mechanical parts; and (7) could perform frequent reaching in all directions with the upper dominant extremity. (Tr. at 63-64.) The VE responded that such an individual could perform work as a shirt presser, a mail clerk, and a counter clerk. (Tr. at 64-65.) However, if such an individual were to take unscheduled breaks for about five minutes every forty-five minutes in addition to regularly scheduled breaks, the VE testified that there would be no jobs available in the national economy. (Tr. at 65-66.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance. If there is evidence to justify a refusal to direct
a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such

decision." Blalock, 483 F.2d at 775.

**Analysis**

As stated above, Claimant asserts that his impairment met or equaled the criteria in Listing

1.04A and he could not have performed other work as found by the ALJ because his testimony

supported greater limitations than she found, and that the ALJ's credibility analysis was in error.

Listing 1.04A:

Sections 404.1525(a) and 416.925(a) provide that the Listing of Impairments (the Listings)

describe each of the major body systems impairments that would be considered "severe enough"

to prevent an individual from doing "any gainful activity", regardless of age, education, or work

experience. A "severe" impairment is one "which significantly limits [one's] ability to do basic

work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); see also, Petry v. Colvin, 2015 WL

5786769, at *6 (S.D.W. Va. Sept 30, 2015). The claimant bears the burden of production and proof

that he or she meets a Listing. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Pass v. Chater,

65 F.3d 1200, 1203 (4th Cir. 1995). In order to satisfy any of the Listing, a claimant must show that his impairment or combination of impairments meets *all* the criteria specified therein. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis added).

Claimant's argument that he met the Listing is governed under 20 C.F.R. pt. 404, Subpt. P, App. 1, Section 1.04, which concerns disorders of the spine. Listing 1.04A requires proof of such a disorder, including a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture. These must result in compromise of a nerve root, including the cauda equine or the spinal cord with

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

The medical evidence of the relevant period, described *supra*, does not support the aforementioned criteria to satisfy Listing 1.04A, let alone any of the Listings as noted by the ALJ. (Tr. at 23.) Contrary to Claimant's argument, his transverse process fractures at L2-L4 did not result in a vertebral fracture according to the objective medical evidence, and his examinations during the relevant period did not manifest abnormal physical findings on a regular basis as envisioned by Section 1.00D:

> Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation. Care must be taken to ascertain that the reported examination findings are consistent with the individual's daily activities.

The ALJ analyzed the medical evidence of record regarding Claimant's back injury, which indicated tenderness and pain and sometimes diminished range of motion, but at no time demonstrated weakness, loss of strength or loss of sensation. (Tr. at 25-26.) In short, the

undersigned **FINDS** that the ALJ did not err when she determined that Claimant's injury failed to satisfy the criteria of any the Listings, and that the ALJ's determination is supported by substantial evidence.

Evaluating Credibility and Pain:

Social Security Ruling 96-7p[7] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See, also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

---

[7] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on March 25, 2016. See, SSR 16-3p, 2016 WL 1131509.

As an initial matter, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.") Claimant only asserts that the ALJ did not believe him. (Document No. 25 at 3.)

The ALJ herein properly performed the two-step process,[8] and then proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms. (Tr. at 24-26.) This evidence included, but was not limited to Claimant's allegations in his applications for benefits as well as his testimony, such as his inability to work due to the injuries he sustained to his back, as well as the numbness in his right leg, his difficulties with sitting, standing, walking and the limitations in his activities of daily living. (Tr. at 24.) The ALJ next reviewed at length the medical evidence of record, discussed *supra*, with multiple citations from the record. (Tr. at 25-27.) After her review of the evidence, the ALJ expressly found that the "[RFC] is supported by the objective medical evidence, the opinions of record, and the beneficiary's hearing testimony." (Tr. at 27.) Notably, the ALJ stated

> I find the beneficiary's allegations are not fully credible. As summarized above, the medical evidence of record reflects conservative, non-surgical treatment during the relevant period. The physical examinations were generally unremarkable other than for muscle spasm, tenderness and reduced range of motion in the lumbar spine and right shoulder (Exhibit 4F). The physical examinations showed the beneficiary retained a normal gait and normal muscle strength throughout. Further, the record shows treatment over a relatively short period of time after the beneficiary's July 201[0] injury – approximately two months. This short period of treatment suggests the beneficiary's symptoms were not as limiting as alleged. In regard to his credibility, I note the beneficiary reports in his function report and his testimony differed in regard to his daily activities. The function report showed the beneficiary

---

[8] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

was more active in performing household chores and helping around the house than his hearing testimony suggested. Also, he submitted records from a November 2010 encounter with Allen L. Tinsley, M.D., a doctor in Paducah, Kentucky (Exhibit 14F). The treatment notes reflect that the beneficiary drove 12 hours suggests that the beneficiary was able to sit for long periods of time, in contrast to his testimony and self-report that he could only sit for 30 minutes (Exhibit 5E).

(Tr. at 27-28.) The ALJ's discussion of Claimant's subjective complaints in addition to the objective medical evidence and the findings therein, is illustrative that the ALJ reviewed the factors promulgated under 20 C.F.R. §§ 404.1529(c), 416.929(c) to assess Claimant's credibility, and is compliant with the Regulations. Claimant's contention that the ALJ based her credibility analysis on the fact that he could squirrel hunt after the accident and that he drove twelve hours on a single occasion for a doctor visit in Paducah, Kentucky is unavailing. The gravamen of the objective medical evidence, including Claimant's own inconsistent statements in the underlying record with his hearing testimony as well as his admissions to certain activities belies his allegation that his impairments were totally disabling. The ALJ properly and thoroughly considered the evidence and reconciled it with Claimant's allegations pursuant to the proper legal authorities. In short, the undersigned **FINDS** the ALJ's credibility analysis was appropriate and based upon substantial evidence.

The RFC Assessment:

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may

be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC

determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider
> the entire record, including all relevant medical and nonmedical evidence, such as a
> claimant's own statement of what he or she is able or unable to do. That is, the SSA
> need not accept only physician's opinions. In fact, if conflicting medical evidence is
> present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Following the discussion of the medical evidence regarding Claimant's impairments, his

allegations and testimony of same, and the evaluation of the opinion evidence, the ALJ

summarized the RFC assessment as described *supra*. The RFC assessment concerning Claimant's

physical impairments included the required narrative discussion that allows for meaningful judicial

review and with respect to the findings of fact and conclusions provided in the written decision, it

is clear that the ALJ complied with the mandate to "build an accurate and logical bridge from the

evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford

v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

With respect to the vocational expert's testimony that an individual would be unemployable

should he need to take additional unscheduled five-minute breaks every forty-five minutes, the ALJ

was not obligated to pose this hypothetical question. Further, an ALJ need only to pose hypothetical

questions incorporating those limitations that an ALJ accepts as credible and that are supported by

the record; in this case, the ALJ determined that the limitations found by the medical consultants,

and in particular, the consultative examiner, W. Roy Stauffer, M.D., whose opinion she afforded

significant weight. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (Tr. at 26.) Clearly, the

ALJ discounted Claimant's self-report that he must remain reclined most of the day when the

majority of the evidence suggested otherwise, moreover, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence, and further **FINDS** that the decision finding Claimant was not entitled to disability benefits during the relevant period, and thereby terminated, is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** Claimant's request for summary judgment (Document No. 33.), **GRANT** the Defendant's request to affirm the decision below (Document No. 34.), and **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 15, 2017.

Omar J. Aboulhosn
United States Magistrate Judge